Filed 8/17/15  P. v. Turner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARLON JUMALE TURNER,<br><br>    Defendant and Appellant. | F068169<br><br>(Super. Ct. No. BF139460A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Marlon Jumale Turner was convicted of possession of cocaine base and marijuana for sale and of active participation in a criminal street gang.  His sentence for the drug-

possession counts was enhanced based on a finding that those offenses were committed for the benefit of or in association with a criminal street gang.

Turner now argues (1) the trial court abused its discretion when it denied both his motion to bifurcate the trial so the gang evidence could be heard separately and his motion to limit the quantity of gang evidence; (2) the admission into evidence of his booking statements, which were used to show his gang membership, was a *Miranda*[1] violation; and (3) substantial evidence did not support the gang-enhancement findings and did not support the finding that he possessed the marijuana for sale.

We agree with Turner's contention that some of the gang evidence was cumulative and the court should either have limited that evidence or bifurcated the trial. Even if it had done so, however, some of the gang evidence would properly have been presented to the jury when it considered the drug charges, because gang evidence was relevant to the issue of intent to sell. In light of this, we conclude that the rulings allowing presentation of cumulative gang evidence were harmless.

The *Miranda* issue is controlled by our Supreme Court's recent decision in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*). Under that decision, the admission of Turner's booking statements was error. This error also was harmless, however, as the other evidence of Turner's gang membership was overwhelming.

We reject Turner's arguments on the sufficiency of the evidence.

The parties state, and we agree, that the conviction on count 3, active street gang participation, should be reversed in light of *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*). The parties also agree that the abstract of judgment contains a clerical error. Finally, they agree that an amendment to the sentencing triad for possession of cocaine base for sale—from three, four, or five years to two, three, or four years—requires resentencing on that count.

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436.

2.

We will reverse the conviction on count 3, order the clerical error corrected, and remand for resentencing on count 1.

## FACTS AND PROCEDURAL HISTORY

A group of Bakersfield police officers surrounded the house at 207 Clyde Street in Bakersfield on the evening of November 22, 2011, intending to perform a legal search of the residence. At least five men were sitting in three cars parked in front of the house. The garage door was raised part of the way. One officer announced "Bakersfield Police Department" and looked under the garage door. Turner, who resided at the house, saw the officer and ran out the back door of the garage. Another officer intercepted Turner. Officers ordered Turner to show his hands. Turner did not comply. The officers knocked him to the ground and arrested him.

Eleven grams of marijuana were found in a plastic container on top of a piano in the garage. Two digital scales, one with a white crystalline residue on it, were also on the piano, with a box of plastic baggies. A police dog detected something under the keyboard cover of the piano. Police looked under the keyboard cover and found a plastic bag containing 20 grams of cocaine base. In Turner's pockets, officers found $407 in cash. There were seven $20 bills, seven $10 bills, 21 $5 bills, and 92 $1 bills.

Turner told officers he was a member of the East Side Crips criminal street gang. He claimed the drugs belonged to his cousin but refused to name the cousin. He said he worked as a stripper but did not remember the last time he was paid cash for stripping.

The district attorney filed an information charging three counts: (1) possession of cocaine base for sale (Health & Saf. Code, § 11351.5); (2) possession of marijuana for sale (Health & Saf. Code, § 11359); and (3) active participation in a criminal street gang (Pen. Code,[2] § 186.22, subd. (a)). The information alleged for sentence-enhancement purposes that Turner committed the offenses in counts 1 and 2 in association with or for

---

[2]All further statutory references are to the Penal Code unless otherwise noted.

the benefit of a criminal street gang.  (§ 186.22. subd. (b).)  The information included additional sentence-enhancement allegations based on a prior serious felony conviction (§§ 667, 1170.12) and three prior prison terms (§ 667.5, subd. (b)).

At trial, the jury heard evidence of the above facts surrounding Turner's arrest. Turner's uncle, who lived at 207 Clyde Street, testified that Turner and another nephew, Turner's cousin Jon Dyer, both often stayed in the garage there.  In the opinion of a police expert, Dyer also was a member of the East Side Crips.

Bakersfield Police Officer Ryan Vaughan, the investigating officer in the case, testified as an expert on illegal drugs.  He opined that the cocaine base and marijuana found in the garage were possessed for sale.  His opinion was based on the fact that the quantity of cocaine, 20 grams, was large, and the digital scale with white residue and the box of baggies indicated that the cocaine was being portioned out and packaged for sale.[3] The relatively large amount of cash in several different denominations in Turner's possession was an indication that sales had taken place.  Turner had a cell phone.  There were no means of smoking the drugs—no pipes or rolling papers—and this indicated that they were not possessed for personal use.

Vaughan also testified about statements Turner made after his arrest.  Vaughan went to the Kern Medical Center emergency room with Turner after the arrest, although Turner was not seriously injured.  While they were in the waiting room, Vaughan read Turner his *Miranda* rights.  Turner indicated he understood his rights and was willing to provide a statement.  He said he was an East Side Crip and his gang moniker was Blacc. He had some gang tattoos.  One, on Turner's right leg, read "187 CBK."  Turner explained that 187 referred to section 187, which defines murder, and "CBK" stood for "Country Boy killer."  The County Boy Crips are rivals of the East Side Crips.  A tattoo on Turner's stomach read "Easty."

---

[3]Two hundred doses based upon a usable quantity being 1/10th of a gram.

Vaughan asked Turner whether he was aware that the East Side Crips engaged in crimes like robbery, burglary, and sales of drugs, including cocaine base and marijuana. Turner said he was. Vaughan also asked Turner some questions about the habits of rival Crips groups. Turner told him that members of different Crips gangs—such as the East Side Crips and the Country Boy Crips—who are rivals outside of prison might associate with one another in prison. A County Boy Crip named Joseph Ferguson tattooed the word Easty on Turner's stomach while Turner was incarcerated, for instance. Turner thought he might associate with Ferguson outside of prison. If an East Side Crip became angry with Ferguson, Turner might smooth things over as a favor to him.

Vaughan and Turner discussed the question of who was responsible for the drugs in the garage. Turner claimed the drugs belonged to a cousin. Turner had asked the cousin not to keep them there. Then Turner said he would take responsibility if he could get a deal. He said, "Man, fuck it. I'll take possession. I'll take a deal right now, six years at 85 percent." He mentioned a prosecutor he knew and suggested that Vaughn call her to propose this deal.

Officer Travis Harless testified as an expert on criminal street gangs. He said the East Side Crips were one of the 11 main gangs in Bakersfield. The East Side Crips had hundreds of members. They wore blue and often had tattoos incorporating words, letters, and symbols indicative of gang membership.

Harless testified that the East Side Crips had a territory on the east side of Bakersfield. All the Bakersfield gangs sold drugs, and African-American gangs like the East Side Crips primarily sold cocaine base and marijuana. Turner's residence, 207 Clyde, was within the East Side Crips' territory. The East Side Crips would not allow rival gang members or people not in gangs to sell drugs in their territory.

The gang engaged in a pattern of criminal gang activity, in Harless's opinion. In addition to drug sales, its primary activities included murder, assault, robbery, and burglary. For gang members, committing these offenses was a way of raising their status

5.

within the gang and engendering fear in members of other gangs, and of raising money to fund their gang "lifestyle."

To prove the predicate offenses necessary to establish a "'pattern of criminal gang activity'" as required by section 186.22, subdivision (e), the prosecution introduced convictions of four men. Harless testified about each of these cases, opining that each crime was carried out for the benefit of or in association with the East Side Crips. The first case was sale and possession for sale of marijuana (Health & Saf. Code, §§ 11359, 11360) by Anthony English in 2010. The second was being a felon in possession of a firearm and being an active member of a criminal street gang (§ 186.22, subd. (a); former § 12021, subd. (a)(1)) by Eugene Cooks in 2009. The third was burglary (§ 460) by Kaylin Evans in 2011. The last was Turner's own conviction of shooting from a vehicle (former § 12034, subd. (b)) with a gang enhancement (§ 186.22, subd. (b)(1)) in 2001. Harless recited the facts of this offense: Turner was driving a car occupied by two other East Side Crips. He drove into Country Boy Crips' territory, and one of his passengers fired 12 rounds from a pistol. Police responded and pursued. Turner's car fled. The shooter got out, attempted to flee on foot, and was shot by officers. Turner continued driving and got away. He was found in the car later.

Harless opined that, at the time of Turner's arrest, Turner was a member of the East Side Crips. His opinion was based on several considerations. First, Harless said he reviewed records of 17 times that Turner had been booked into Kern County Jail, from 1998 to his arrest for the current offenses in 2011. Each time, Turner identified himself to the booking officer as a Crip to make sure he would be housed away from rival Bloods gang members.

Next, Harless testified that he reviewed 11 "street checks" involving Turner. The most recent of these was from October 27, 2011, a few weeks before Turner's arrest for the current offenses. On that date, Turner spoke to officers during a traffic stop that took place in East Side Crips' territory. He admitted he was an East Side Crip and said he was

6.

an "OG," meaning "original gangster." He had over $1,000 in cash in his possession, in small bills, "wadded up and kept in various pockets." Harless testified that the money was "consistent with narcotics sales." Turner claimed he earned the money working as a stripper, but the officers found no "costumes or stripper type clothing." In the remaining 10 street checks, Turner was found in East Side Crips' territory eight times; admitted to East Side Crips membership or former membership six times; was accompanied by another East Side Crip member five times; and was wearing blue once.

Harless also testified about eight offense reports in which Turner was mentioned. These reports pertained to offenses occurring from 2007 to 2011. The most recent report described the current offenses. Harless said it was significant because the offenses took place in East Side Crips' territory; selling cocaine base is one of the East Side Crips' primary activities; three of the men found in the cars in front of the house were East Side Crips members; and Turner admitted gang membership.

There were two reports from 2010. In one of these, Turner was described as being found at a market in East Side Crips' territory in the company of other East Side Crips members. The market was the place where Eugene Cooks was arrested for the predicate offense described above. The other 2010 report described Turner being seen at another market "where East Side Crips sell narcotics" in East Side Crips' territory. On that occasion, Turner "was in possession of rap lyrics, which spoke about the East Side Crips."

Harless testified about two offense reports from 2009. One described a traffic stop of Turner and another East Side Crip in East Side Crips' territory. The other report stated that Turner was found in East Side Crips' territory in possession of a blue rag.

There were two more reports from 2008. In one, "Turner was identified as a suspect who committed a robbery …." Officers arrested him after a short car chase. "The significance was that robbery is one of the primary activities of the East Side Crips," Harless said. The second 2008 report stated that Turner was contacted during a

7.

traffic stop in East Side Crips' territory. Finally, a report from 2007 stated that officers encountered Turner with an East Side Crip in East Side Crips' territory.

Harless based his opinion about Turner's gang membership in part on Turner's gang tattoos. He took photographs of these tattoos. Fifteen of these photographs were admitted into evidence and shown to the jury. Among the tattoos shown were one consisting of the letters M, O and B, which, as Harless explained, stood for "made out of Bakersfield." Another photo showed the tattoo displaying the number 187, for the Penal Code section defining murder, and "CBK," for Country Boy killer.

Finally, the material forming the basis of Harless's opinion that Turner was an East Side Crip included a music video titled "Project Livin'," starring Turner under the name Blacc 'n Mild. The video was played for the jury, which also was provided with a transcript of the lyrics. Harless described the images shown in the video. The setting was public housing projects and other locations in East Side Crips' territory. One location shown was where East Side Crips "sell drugs most of the day, every day." Another was an abandoned building that Harless recognized as a place frequented by smokers of cocaine base. People with East Side Crips' tattoos were shown. They made gang hand signs and handled firearms. "At one point, you see what appears to be Mr. Turner preparing cocaine base. You see subjects conducting what appears to be a hand-to-hand narcotics transaction." Turner wore a blue hat and shirt. He had a revolver in his waistband. He sang that he had his "little homie," the gun, and was protecting the turf. The lyrics sung by Turner went on to say that if rivals entered the territory, "we wettin' your shirt," meaning they would be shot and made bloody. The lyrics also referred to a shootout with police in which Leon Anderson, a former leader of the East Side Crips, was killed. A cemetery in which some East Side Crips were buried appeared in the video. Graves of three members were shown.

During one segment of the video, Turner measured a white powder in a measuring cup and put it into a pan while standing at a stove. He sang that dope fiends were on a

8.

mission to find drugs, so he was in the kitchen preparing some. He said he had "it soft or hard," meaning he had both powder cocaine and cocaine base. Later, while holding a gun, Turner sings, "I've got a gun in my hand. And I'm ready to ride." Harless said this meant Turner was looking for rival gang members to shoot.

Harless was asked for his opinion on whether crimes like the ones for which Turner was being tried would be gang related. The prosecutor stated a detailed hypothetical based closely on the People's evidence in this case. Harless said his opinion was that "the possession [for sale of cocaine base and marijuana] was committed for the benefit or, at least, in association with the East Side Crips." The bases for his opinion were: (1) sales of these drugs were among the gang's primary activities, "and that's how they earn their money to fund their lifestyle"; (2) the offenses occurred inside the gang's territory, and "you have to be an East Side Crip to sell drugs there" because gang members would not allow nonmembers to sell within the territory; (3) the quantity of cocaine base found was consistent with sales, not personal use; (4) the cash in the hypothetical perpetrator's pockets was an indication of sales activity; (5) the perpetrator admitted gang membership and knowledge of the gang's drug-selling activities; and (6) other gang members were present in front of the house.

The prosecutor played for the jury audio recordings of telephone conversations between Turner and his girlfriend (later his wife), Cassandra Johnson. The conversations took place while Turner was in jail after his arrest on the current charges. In one conversation, Johnson and Turner discussed a plan for Johnson to obtain a letter from Turner's cousin, Jon Dyer. In the letter, Dyer would take responsibility for the drugs found in the garage.

A notarized, handwritten affidavit, signed by Dyer, was introduced into evidence. Cassandra had delivered this document to the district attorney's office about two weeks after Turner's arrest. In the affidavit, Dyer said he "take[s] full responsibility of the cocaine [and marijuana] that were found" in the garage. The affidavit further stated that

9.

Turner did not know of the drugs, that Dyer knew Turner was subject to parole searches, and that Dyer was sorry for the results of his actions.

The defense called Dyer as a witness, but Dyer invoked his Fifth Amendment privilege against self-incrimination and refused to testify. The court found him to be unavailable and released him from his subpoena.

In another of the recorded telephone conversations, Johnson said, "I know what you did cause like I told you I listened to you and stuff but you actually wanted me to be like Chef Boyardee?" A few moments later, Turner said, "[T]here's no way you could fuck it up." Johnson said, "Yeah. Okay." Turner continued, "Well, you … you kinda would want to do it because the 1st is comin' in." Johnson replied, "Shut your ass up." Officer Vaughan opined that Turner and Johnson were discussing the preparation of cocaine base. He said the reference to "the 1st" meant the first of the month, when many drug users receive benefit checks and many drug dealers are ready to supply them.

Michael Boerger testified for the defense. He had a recording studio in his house. He produced Turner's music video "Project Livin'" and posted it on YouTube. Boerger and Turner wrote the lyrics together. Boerger had made one other video for Turner, featuring Turner performing on stage at a public event. Boerger and Turner had also collaborated on numerous musical recordings. Boerger stated that he, Turner, and one other man had been working together to try to get a record contract and succeed in the music business. Turner had made a name for himself in rap music in Bakersfield. In Boerger's view, the point of the "Project Livin'" video was "to talk about, you know, drugs, violence, kind of the sad things about the things that go on in lower class neighborhoods." The style of the video was in conformity with a rap tradition.

Natasha Reed, a cousin of Turner's, testified for the defense. She stated that Turner worked as a male dancer and she acted as his booking agent. She kept in her possession materials he used in his dance performances, such as outfits, whips, and poles. She lived at 207 Clyde Street at the time of Turner's arrest, and she stated that Dyer lived

10.

there as well. She was familiar with the piano in the garage: "You know, if you were trying to hide drugs, money, things of that nature, we'd place it in the piano."

Officer Vaughan, testifying as a rebuttal witness, said no whips or poles were found when the house was searched. Vaughan also testified that it was not uncommon, in his experience, for a person with no prior convictions to offer to take the blame for a drug charge against a friend or relative whose criminal history would lead to a long prison term. Dyer had no prior convictions.

In her closing argument, Turner's trial counsel argued that the drugs belonged to Dyer. Relying on inconsistencies in the police testimony, counsel contended that Turner was not even in the garage when the police arrived, and instead exited the house from the kitchen. The prosecutor argued that the drugs belonged to Turner, but even if they belonged to Dyer, Turner was still one of the people in possession of them and was guilty of possession for sale as an aider and abettor.

The jury found Turner guilty as charged and found the gang-enhancement allegations true. The court found the prior-conviction allegation and two of the prior-prison-term allegations true. It found one prior-prison-term allegation not true.

The court sentenced Turner to a prison term of 20 years 4 months, calculated as follows: On count 1, eight years (equal to double the middle term of four years), plus five years for the prior serious felony, three years for the gang allegation, and one year each for the two prior prison terms; on count 2, one year plus one year for the gang allegation. The sentence on count 3 was stayed pursuant to section 654.

### DISCUSSION

I. *Bifurcation and limitation of gang evidence*

Before trial, Turner filed a motion to bifurcate and an alternative motion to limit the gang evidence. In the motion to bifurcate, Turner argued that the evidence relevant to the gang enhancements on counts 1 and 2 and to the gang-participation charge in count 3 would have an excessively prejudicial effect on the jury's consideration of the drug-

11.

possession charges. Turner argued that the main factual dispute was over the question of whether the drugs were possessed by him or Dyer, and that the gang evidence had little relevance to that issue.

In the motion to limit the gang evidence, Turner argued that if the court did not bifurcate the trial, it should exclude portions of the prosecution's evidence in order to minimize the likelihood of the jury finding him guilty of possession for sale because of his bad character and prior bad acts. The motion stated, first, that Turner should be permitted to stipulate that the East Side Crips were a criminal street gang, thus avoiding the need to present evidence of this, especially evidence of predicate offenses by gang members. Next, the motion argued that the prosecution should not be permitted to use nine specific incident reports that described incidents involving Turner but included no gang-related facts. The motion requested exclusion of photographs of Turner's tattoos and offered to stipulate that he had gang tattoos. It also sought a ruling barring the prosecution's gang expert from mentioning the total numbers of bookings, street checks, and incident reports he reviewed. Instead, the expert should be allowed to refer only to bookings, checks, and reports that were relevant to the gang allegations. The motion requested exclusion of gang-related testimony from any officer except the prosecution's gang expert. And the motion requested a hearing under Evidence Code section 402 to determine the scope of the expert's testimony, and in particular to establish that the expert would not be permitted to testify about non-gang-related facts in Turner's offense reports, booking records, or street checks. The motion specified that Turner did not object to the four most recent offense reports. It also specified that Turner did not object to materials that were discussed at the preliminary hearing, including booking reports, tattoos and street checks, apart from the objections already discussed.

The trial court first denied the motion to bifurcate. It stated that Turner's gang participation and the gang-relatedness of the possession offenses were relevant to motive, and motive in turn was relevant to the issue of whether there was an intent to sell. In

light of this, the prejudicial effect of the gang evidence did not substantially outweigh its probative value for the possession charges.

The court then turned to the motion to limit the gang evidence. Noting that the prosecution had declined to agree to a stipulation that the East Side Crips were a criminal street gang, the court denied Turner's request to proceed upon such a stipulation. The court agreed to hold an Evidence Code section 402 hearing to discuss the gang expert's testimony and deferred ruling on the requests to limit the expert's testimony until after that hearing. The court granted the request to bar the gang expert from including in a statement of the number of booking records, street checks, and incident reports he reviewed, any documents that had no relevance to the gang issues. After noting the prosecutor's statement that he had no photographs of Turner's tattoos, the court granted Turner's request to exclude multiple tattoo photographs; but it implied that it would revisit the issue if necessary, saying the absence of photographs meant there was "no issue to be decided" at that time. The court also granted Turner's request that police testimony regarding gang issues come in only through a single officer designated as the prosecution's gang expert.

At the Evidence Code section 402 hearing, the prosecutor questioned Officer Harless, taking him through essentially all the evidence he ultimately relied on at trial to support his opinions. Defense counsel cross-examined Harless. Afterward, defense counsel asked the court for several specific rulings. She sought a limit on the number of predicate offenses the prosecution could present to satisfy the requirements of section 186.22, subdivision (b). She asked for a limit on the number of street checks and booking records the expert could mention, arguing that too many would be prejudicial. She objected to six specific offense reports as either cumulative or too remote in time. She objected to offense reports in which Turner admitted to gang membership or was with a gang member but was not alleged to have committed a crime.

In its ruling, the court excluded mention of four of the offense reports. It also ruled that, when discussing the offense reports, the expert was not to mention parole or parole violations on Turner's part. It rejected Turner's request to limit the number of booking records and street checks the expert would mention. The court rejected the prosecutor's request to introduce seven predicate offenses and imposed a limit of four specified offenses to be used as predicates, including Turner's own conviction for shooting from a vehicle in 2001.[4] The court deferred ruling on the tattoo photos as these still had not been proffered by the prosecution. The parties do not cite, and we have not found, any place in the record where Turner's objection to the photos was renewed; and as noted above, 15 photos were introduced into evidence.

Turner now argues that the trial court abused its discretion when it denied the motion to bifurcate. He further argues that if the court acted within its discretion when it denied bifurcation, then it abused its discretion by not imposing stricter limits on the gang evidence the prosecution could present. Both arguments are founded on the proposition that, even if all the gang evidence presented was otherwise admissible, much of it was cumulative, and its nature was so damaging and its quantity so large that it was substantially more prejudicial than probative within the meaning of Evidence Code section 352.

---

[4]Defense counsel moved in limine to bar or sanitize Turner's gang-related shooting offense for impeachment purposes in case Turner testified. The court denied that motion, and defense counsel reserved for later the question of whether that offense should be admitted to prove the gang allegations. Later, the court considered the prosecution's motion in limine to use that conviction for that purpose. Cited in the People's in limine brief was *People v. Tran* (2011) 51 Cal.4th 1040, 1048-1049, which held that a defendant's own prior conviction can be (but is not necessarily) admissible as a predicate offense for purposes of a gang enhancement, even when proof of other gang members' offenses is available. Defense counsel stated that she had nothing to add to her previous comments. The prosecution's motion was granted.

As our Supreme Court observed in *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez*), a gang enhancement under section 186.22, subdivision (b), requires proof of a number of facts beyond the elements of the underlying crime, including the facts that a criminal street gang, as defined, exists, and that the defendant committed the crime for the benefit of, at the direction of, or in association with the gang. (*Hernandez, supra,* at p. 1047.) Proving these facts may involve evidence of prior offenses or bad acts by the defendant. In nongang cases, a trial court has discretion to bifurcate the determination of a prior-conviction allegation from the determination of guilt of the charged offense. (*Id.* at p. 1048.) Further, a court in a nongang case should exclude evidence of the defendant's gang membership if it is potentially prejudicial and its probative value is minimal. (*Id.* at p. 1049.) Similarly, a trial court has discretion to bifurcate the trial in a gang case to avoid the danger of the jury being improperly influenced by the gang evidence when it decides whether the defendant is guilty of the charged crime. Predicate offenses offered as part of the proof of a gang's existence (i.e., the "'pattern of criminal gang activity'" element in § 186.22, subd. (e)) "need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation." Further, "some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez, supra,* at p. 1049.)

Despite these considerations, "less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Hernandez, supra*, 33 Cal.4th at p. 1048.) This is because "[a] prior conviction allegation relates to the defendant's *status* and may have no connection to the charged criminal offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Ibid.*) Further, because there are efficiencies to be gained by conducting a nonbifurcated trial, some evidence that

15.

would be inadmissible (under Evid. Code, § 352, for instance) at a trial of the underlying crime alone can be admitted in a nonbifurcated trial of an offense with a gang enhancement. (*Hernandez, supra,* at p. 1050.) The burden is on the defendant to show that the considerations favoring a nonbifurcated trial are substantially outweighed by a danger of undue prejudice. (*Ibid.*) The danger of undue prejudice must be clearly established by the defendant. (*Id.* at p. 1051.)

Similar considerations govern a motion to limit gang evidence in a nonbifurcated trial that includes gang allegations. In cases in which there was no gang enhancement, but gang evidence was relevant to the charged offense because of its connection to matters such as motive or identity, our Supreme Court has held that the gang evidence should be excluded if it is substantially more prejudicial than probative. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Williams* (1997) 16 Cal.4th 153, 193.) "[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams, supra,* at p. 193.) The Courts of Appeal have applied the same reasoning to claims that some of the gang evidence admitted to prove a gang enhancement was cumulative and had an inflammatory impact beyond the impact properly created to prove the gang enhancements. (*People v. Leon* (2008) 161 Cal.App.4th 149, 169; *People v. Williams* (2009) 170 Cal.App.4th 587, 610-611.)

Leon was convicted of burglary and other offenses with gang enhancements. (*People v. Leon, supra*, 161 Cal.App.4th at p. 152.) As part of the evidence admitted to prove the gang enhancements, the prosecution was allowed to use Leon's juvenile robbery adjudication as a predicate offense and as an indication of Leon's gang membership. (*Id.* at pp. 164-165.) The Court of Appeal held that the prior adjudication was relevant, but the other evidence of the existence of the gang and Leon's membership was overwhelming. Consequently, the prior was cumulative evidence. The likelihood of

prejudice from it was high, and the trial court abused its discretion by admitting it. (*Id*. at p. 169.) The Court of Appeal went on to hold that the error was harmless. (*Id*. at p. 170.)

Williams was convicted of being a felon in possession of a firearm and other offenses, with gang enhancements. (*People v. Williams, supra*, 170 Cal.App.4th at p. 595.) As part of the proof of the enhancements, the trial court admitted "evidence of dozens of prior crimes." (*Id*. at p. 610.) The Court of Appeal concluded that this was "cumulative evidence concerning issues not reasonably subject to dispute," and its admission was error despite its relevance. (*Id*. at p. 611.) That court also determined the error was harmless. The evidence of guilt of the underlying offenses was overwhelming. (*Id*. at pp. 612-613.)

We agree with the view of the People and the trial court that much of the gang evidence in this case was admissible to prove not only the gang enhancements (and the gang-participation offense charged in count 3), but also the underlying charges of possession of drugs for sale. The evidence that Turner was an East Side Crip, that the East Side Crips were a gang that sold cocaine base and marijuana as primary activities, and that the offenses took place in the East Side Crips' exclusive drug-selling territory, all had a tendency in reason to show that Turner's intent in possessing the drugs was to sell them. Even in a bifurcated proceeding, some of this evidence would have been admissible to prove Turner's intent to sell.

At the same time, however, there was not much dispute about the gang facts, and not much dispute about whether the drugs were possessed for sale. The primary issue at trial was whether drugs were in Turner's possession. Turner's theory was that they were Dyer's drugs. The quantity of cocaine base, the scale with white residue, and the packaging materials—all found in close proximity to one another—left virtually no doubt about what the person or people who possessed the cocaine intended to do with it. Turner admitted he was an East Side Crip when he was arrested, and the existence of the

East Side Crips and their drug-selling activities could easily be established without the use of evidence involving Turner's own past actions.

For these reasons, we conclude that, as in *People v. Leon* and *People v. Williams*, the trial court abused its discretion by allowing the jury to be exposed to cumulative evidence. The evidence went beyond showing that Turner was a member of a gang that sold drugs and by implication likely intended to sell the drugs found in his garage. It also showed long-term gang membership and a long record of criminal activity. The court could have avoided the presentation of cumulative evidence by limiting the gang evidence or bifurcating the trial.

We turn next to the question of whether the error was prejudicial or harmless. As in *People v. Leon* and *People v. Williams*, the applicable standard for prejudice is the *Watson* standard, i.e., we reverse only if it is reasonably probable that a more favorable result would have been obtained absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Leon, supra*, 161 Cal.App.4th at p. 170; *People v. Williams, supra*, 170 Cal.App.4th at p. 612.)

We disagree with Turner's contention that the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 applies. We are not dealing with federal constitutional error, for the cumulative evidence did not render the trial fundamentally unfair and thus violate due process. Unlike *People v. Albarran* (2007) 149 Cal.App.4th 214, 232, this case is not one of the "rare and unusual occasions" on which the jury heard gang evidence from which no permissible inferences could be drawn or which was extraordinarily inflammatory. We are dealing with state-law error only.

Under the *Watson* standard, the error was harmless. This is not a case in which, but for the improperly admitted evidence, the jury would have had no knowledge of the defendant's criminal past. Here the jury still would have known that Turner was a gang member. It also would have known of the most serious item the prosecution proffered—the 2001 shooting—since Turner's trial counsel did not object to that item. In general,

18.

the impact of the cumulative evidence was to underscore Turner's gang activity. As we have said, that activity was relevant to the drug charges, and we do not think it is reasonably probable that the jury was pushed over the reasonable-doubt threshold by the extra emphasis on it.

## II. *Substantial evidence of gang-relatedness and intent to sell marijuana*

### A. *Gang-relatedness*

Turner contends that the evidence presented at trial was insufficient to prove the gang enhancements. Specifically, he maintains that the evidence was insufficient to show that he committed the drug-possession offenses "for the benefit of, at the direction of, or in association with any criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members .…" (§ 186.22, subd. (b)(1).)

When considering a challenge to the sufficiency of the evidence to support a judgment, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which the finder of fact could make the necessary finding beyond a reasonable doubt. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

There was overwhelming evidence that Turner was an East Side Crip. Expert testimony and Turner's rap video showed that selling drugs was a prominent activity of the East Side Crips and that this activity benefitted the gang. Other East Side Crips were present on the property when Turner was arrested. Expert testimony showed that only East Side Crips were allowed to sell drugs in the territory where Turner's house was located. This evidence was circumstantial, but it was adequate. The jury could reasonably infer, beyond a reasonable doubt, that Turner's gang membership and his

19.

possession of drugs for sale were related not by coincidence, but by the connections required by section 186.22, subdivision (b).

### B. *Intent to sell marijuana*

Turner argues that the evidence was not sufficient to support the conviction of possession of marijuana for sale. He says the evidence did not show his intent to sell the marijuana. We disagree.

Turner relies on the small quantity of the marijuana (11 grams, which is less than half an ounce) and the fact that it was not packaged. He grudgingly acknowledges the context in which the marijuana was found: together with a large quantity of cocaine base, with *two* scales, only one of which had cocaine residue on it, with packaging materials, with no smoking materials, and in the possession of a member of a gang that had marijuana sales as one of its primary activities—a member who possessed cocaine base for sale and had displayed his enthusiasm for drug sales in a rap video starring himself. However, he discounts the evidence and the expert's opinion on possession for sale as "feeble." We disagree. In sum, the marijuana was found in the possession of a drug seller among ample evidence of a drug-selling operation. From this, the jury could reasonably infer that the marijuana was possessed for sale.

### III. *Gang-participation charge*

We agree with the parties' view that Turner's conviction on count 3, active participation in a criminal street gang, must be reversed under *Rodriguez*. *Rodriguez* deals with the meaning of the requirement that, to be guilty of active gang participation under section 186.22, subdivision (a), a person must promote, further, or assist in criminal conduct "by members of that gang." Specifically, the case answers the question whether this language means the prosecution must prove the defendant committed a predicate offense, either as a principal or as an aider and abettor in concert with another person who was a gang member. (*Rodriguez, supra,* 55 Cal.4th at pp. 1128, 1131.) Some courts, including this one, have held that this was not required and that a person

20.

could be proved to be a gang member based on a predicate offense in which he or she acted alone. (See *People v. Salcido* (2007) 149 Cal.App.4th 356, 368, overruled by *Rodriguez, supra*, 55 Cal.4th at p. 1137, fn. 8.) Rejecting this view, the Supreme Court explained its reasoning as follows:

> "Section 186.22(a) speaks of 'criminal conduct by *members* of that gang.' (Italics added.) '[M]embers' is a plural noun. The words 'promotes, furthers, or assists' are the verbs describing the defendant's acts, which must be performed willfully. The phrase 'any felonious criminal conduct' is the direct object of these verbs. The prepositional phrase 'by members of that gang' indicates who performs the felonious criminal conduct. Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez, supra*, 55 Cal 4th at p. 1132.)

This holding applies here. The People did not attempt to prove that Turner committed an offense in concert with anyone. It follows that he was not proven guilty of violating section 186.22, subdivision (a), and his conviction on count 3 must be reversed.

## IV.     *Miranda*

Turner argues that the booking questions that elicited Turner's 17 admissions that he was a gang member were parts of custodial interrogations and were inadmissible because not preceded by *Miranda* warnings; further, they did not fall within the booking exception to *Miranda* first recognized in the plurality opinion in *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601-602. The California Supreme Court accepted the same argument in *Elizalde*, a murder case with gang enhancements:

> "Here we consider whether routine questions about gang affiliation, posed to defendant while processing him into jail on murder charges, come within *Miranda*'s well-recognized booking exception. We hold that the questions exceeded the scope of the exception and that officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending

21.

charges. While officers were permitted to ask these questions for institutional security purposes, defendant's un-Mirandized responses were inadmissible against him during the case-in-chief." (*Elizalde, supra*, 61 Cal.4th at p. 527.)

In *Elizalde*, it was reasonably likely that a booking question about gang affiliation would elicit an incriminating response because gang membership is relevant to offenses and enhancements in the Penal Code; the gang in question had a history of violence against rivals; and the defendant was charged with murder, a crime often committed for the benefit of gangs. (*Elizalde, supra*, 61 Cal.4th at pp. 538-540.)

Under the doctrine established by *Elizalde*, the applicability of *Miranda* to admissions of gang membership made in response to booking questions thus depends in part on the crime for which the defendant was arrested. The record in this case does not contain complete information about the 17 arrests after which Turner admitted gang membership. We will assume for the sake of argument, however, that in asking Turner about his gang membership, the booking officers could reasonably expect to elicit responses that could be used against Turner in a criminal proceeding. Since Turner was not Mirandized, his answers should not have been used against him in this case.

As in *Elizalde*, however, the error was harmless. The *Elizalde* court held that the *Chapman* standard of prejudice applied—the error is harmless only if it is shown beyond a reasonable doubt that the error did not contribute to the verdict. The error was harmless because the defendant's gang membership was convincingly established by other evidence. (*Elizalde, supra*, 61 Cal.4th at p. 542.) Here, there was extensive other evidence that Turner was an East Side Crip, including his tattoos, his Mirandized admission after his arrest for the current offense, and his conviction for the 2001 shooting, which included a gang enhancement. This evidence shows beyond a reasonable doubt that the jury would have reached the same conclusions without the evidence of Turner's answers to the booking questions.

22.

## V. *Clerical errors and sentencing amendment*

The parties agree that the abstract of judgment does not correctly reflect the sentence the court orally pronounced on count 2. The court stated that the sentence was one year, plus a one-year enhancement. The clerk's minutes and the abstract of judgment, however, erroneously show a sentence of one year four months plus an enhancement of one year. We will direct the court to correct the mistake.

The parties also agree in supplemental briefs that an amendment to Health and Safety Code section 11351.5, which reduced the sentencing triad for that section (Stats. 2014, ch. 749, § 2), requires a remand for resentencing on count 1. The amendment changed the triad from three, four, or five years to two, three, or four years. The sentence on count 1 was based on the middle term, which formerly was four years. On remand, the court must consider the new triad.

## DISPOSITION

The conviction on count 3 is reversed. The case is remanded to the trial court for resentencing on count 1 in accordance with Health and Safety Code section 11351.5 as amended. When preparing a new abstract of judgment, the court is directed to correct the sentence on count 2 to reflect its oral pronouncement of a term of one year plus a one-year enhancement. The judgment is affirmed in all other respects.

_____
Smith, J.

WE CONCUR:


_____
Gomes, Acting P.J.



_____
Kane, J.

23.